# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                    **CASE NO: 2:11-CR-108-FtM-29SPC**

**VICTOR DONGREL WILSON**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on Defendant Victor Dongrel Wilson's Motion to Suppress (Doc. #81) filed on May 16, 2012. The Government filed its Response in Opposition (Doc. #83) on May 30, 2012. The Court held an evidentiary hearing on June 20, 2012. The Defendant was present and represented by Counsel Roy W. Foxall. The Government was represented by Assistant United States Attorney Jeffrey Michelland.

At the hearing, the Government called two witnesses: Detective Rob Smith of the Lee County Sheriff's Office and Special Agent James M. Roncinske of the Federal Bureau of Investigation. The Government also introduced six exhibits: an audio-video recording of the first interview of the Defendant on October 8, 2011 (Govt. Ex. #1), the Waiver of Rights Form signed by the Defendant (Govt. Ex. #2), an audio-video recording of the conversation between the Defendant and Michael Harrell in the interview room on October 8, 2011 (Govt. Ex. #3), an audio-video recording of the second interview of the Defendant on October 8, 2011 (Govt. Ex. #4), an audio of the telephone conversation between the Defendant and Michael Harrell on October 7, 2011 (Govt. Ex. #5), and the transcript of the telephone conversation between the Defendant and Michael Harrell on October 7, 2011 (Govt. Ex. #6). The Defense called

Defendant Wilson as a witness. Upon consideration of the testimony presented at the hearing and the Parties' briefs, the undersigned recommends that the Motion to Suppress be denied for the reasons set forth below.

## **BACKGROUND**

On October 8, 2011, Defendant Victor Dongrel Wilson was arrested and charged with attempted bank robbery in violation of Title 18, United States Code, Sections 2113(a) and 2. On October 13, 2011, the Grand Jury returned a four count indictment against the Defendant. Defendant Wilson is charged with Count One, conspiracy to commit or to defraud the United States under Title 18, United States Code, Section 371; Count Two, conspiracy to carry/possess a firearm during or in furtherance of drug trafficking offense or crime of violence under Title 18, United States Code, Section 924(o); and Count Eight, bank robbery under Title 18, United States Code, Section 2113(a) and Section 2. (Indictment, Doc. #10). On December 7, 2011, Defendant Wilson was also charged with another count, Count Nine, bank robbery under Title 18, United States Code, Section 2113(a) and Section 2. (Superseding Indictment, Doc. #51). Defendant seeks to suppress statements made on October 8, 2011, made during his second interview at the Lee County Sheriff's Office. (Doc. #81).

## **TESTIMONY AND EVIDENCE**

**Detective Rob Smith: (Tr. 4-43, 97-100)**

Detective Rob Smith (Det. Smith) is employed with the Lee County Sheriff's Office (LSCO) as a detective. (Tr. 4:22-23). He has been a detective with the LCSO since April of 2007. (Tr. 5:3). The LSCO trained him in conducting interviews and in administering Miranda rights. (Tr. 5:15-23). Det. Smith testified that he was on duty October 8, 2011, conducting surveillance and was eventually involved in the takedown and arrest of the suspects of the investigated crimes, including Defendant Wilson. (Tr. 7:7-21). After Defendant Wilson was

arrested, Det. Smith and Agent Kevin McCormick (Agt. McCormick) of the Federal Bureau of Investigation (FBI) conducted an interview of the Defendant. (Tr. 7:24-8:14). The interview took place in Interview Room 2 at the LSCO headquarters in the Major Crimes Unit. (Tr. 9:7; Govt. Ex. #1). Det. Smith testified that he read Defendant his <u>Miranda</u> rights as required once a suspect is arrested. (Tr. 14:4-6) He also testified that he made sure Defendant understood his <u>Miranda</u> rights by asking him a couple of times if he did. (Tr. 42:16-22). Det. Smith witnessed the Defendant sign the Waiver of Rights Form. (Tr. 13:20-23; Govt. Ex. #2). The recording started at 2:07 a.m. (Tr. 12:17; Govt. Ex. #1). Defendant invoked his right to counsel at 2:44 a.m. (Govt. Ex. #1).

A warrant was executed to obtain Defendant's DNA after Defendant invoked his right to counsel in the first interview. (Tr. 24:5; Govt. Ex. #1). Det. Smith testified that he did not execute the DNA warrant immediately because his main goal was to talk to the Defendant about the incident. (Tr. 33:2-3). Det. Smith testified that he asked Agt. McCormick about the DNA warrant in front of the Defendant after he invoked his right to counsel. (Tr. 24:4-6). Det. Smith testified he had a duty to execute the warrant and was following the orders of the Court. (Tr. 24:11-19). Defendant asked the agents questions about the DNA warrant and they engaged in discussion about the warrant. (Govt. Ex. #1). He testified that he believed that Defendant's statements and questions about the DNA warrant did not re-initiate discussion with him about the crimes. (Tr. 23:13-18). The DNA was obtained, and Det. Smith and Agt. McCormick left the room. (Tr. 24:24-25:3; Govt. Ex. #1).

At 2:56 a.m., Det. Smith testified that he had gone back into the interview room and handcuffed the Defendant. (Tr. 15:7-10). Det. Smith then placed him into Interview Room 3 with Co-Defendant Michael Harrell (Harrell) who had been interviewed by another detective and

agent prior to Defendant's placement in the room. (Tr. 15:13-25; Govt. Ex. #3). Det. Smith hoped the two would talk to each other about the crimes. (Tr. 17:19-22). However, they did not talk about the crimes with each other. (Tr. 17:23-24; Govt. Ex. #3). Det. Smith listened to the audio during the time Harrell and Defendant were together. (Tr. 20:21-21:1, 30:3-5). During this time, Defendant Wilson called his interviewers "crackers" and "bitches." (Tr. 20:9; Govt. Ex. #3). At 3:14 a.m., Det. Smith removed the Defendant from Interview Room 3 and placed him back in Interview Room 2 until he was ready for booking. (Tr.18:8-20, 20:2-9).

Det. Smith stated that he removed Defendant from Interview Room 3 because he did not appreciate how the Defendants talked about him. (Tr. 31:23-24). Det. Smith testified that he was upset when Defendant "went back to that same gangster, laughing about stuff, making comments about [. . .] that cracker . . ." attitude when speaking with Co-Defendant Harrell. (Tr. 21:25-22:3). Det. Smith testified that he confronted the Defendant about the remarks he made to Harrell while in Interview Room 3. (Tr. 22:4-15). Det. Smith testified that he stood at the doorway, while the Defendant sat in Interview Room 2. (Tr. 21:5-18). No one else was present and no audio or video were recorded. (Tr. 21:11-16). He testified that he reminded Defendant that he had an attorney, he did not want him to speak, and he was not asking him questions. (Tr. 22:10-15). Det. Smith told Defendant that even though he had asked for an attorney that did not prevent him from speaking to Defendant. (Tr. 22:7-10). He stated to Defendant that he should think about his daughter and about where his life was going. (Tr. 22:11-12). He stated he reminded the Defendant at least twice that he asked for an attorney because he knew this was going to be a high-profile case. (Tr. 23:23-24:3).

After the hallway interaction with Det. Smith, the Defendant was left alone in Interview Room 2. (Tr. 24:24-25:3). Det. Smith testified that sometime later the Defendant knocked on the

door. (Tr. 25:8). Det. Smith stated that he was between five and ten feet from the door when he heard the Defendant knock. (Tr. 98:15-17). Det. Smith opened the door, and asked what Defendant wanted. (Tr. 25:10-14). Det. Smith testified that Defendant stated, "I want to talk." (Tr. 25:13-14, 26:17). Det. Smith testified that he was the only one at the doorway and no one else was present when Defendant knocked on the door. (Tr. 25:18-24). There is no video or audio in the hallway. (Tr. 32:12-14). Specifically, Det. Smith stated to Special Agent Roncinske (Spec. Agt. Roncinske) that, "I think it's a good chance to get your interview." (Tr. 26:23-27:6).

While Det. Smith was speaking with Spec. Agt. Roncinske, Defendant was brought into the hallway. (Tr. 28:11-12). Det. Smith testified that he did not know how the Defendant got into the hallway, only that he was brought into the hallway by another officer. (Tr. 29:3-8). Det. Smith testified that he never offered the Defendant help and did not say, "The only way that you're going to get out of this is if you help us," as Defendant alleges. (Tr. 98:12-14). Det. Smith testified that he was able to hear some of the discussion between Defendant and Spec. Agt. Roncinske. (Tr. 28:5-12). Specifically, he heard Defendant ask, "Is this going to help me?" (Tr. 28:8-9). He heard Spec. Agt. Roncinske say, "I can't make any promises whether it's going to help you." (Tr. 28:10-11). Det. Smith then heard Defendant state that he wanted to listen to an audio recording. (Tr. 28:11-12). Det. Smith testified that the conversation between Spec. Agt. Roncinske and Defendant took place in the hallway, outside the interview rooms. (Tr. 28:13-18). Afterwards, Spec. Agt. Roncinske walked Defendant back into Interview Room 2.

**Special Agent James M. Roncinske: (Tr. 45-70, 94-97)**

Special Agent James M. Roncinske is employed with the FBI as a special agent and has been employed over twelve years. (Tr. 45:14-18). Spec. Agt. Roncinske was one of the lead FBI agents involved in the investigation concerning the Defendant. (Tr. 46:13-16). On October 7, 2011, Spec. Agt. Roncinske monitored a wiretap placed on Harrell's cellular telephone, which

eventfully lead to the execution of search warrants and arrests of individuals in the early morning hours of October 8, 2011. (Tr. 47:5-9). Spec. Agt. Roncinske initially interviewed Co-Defendant Matthew Rollins and another individual. (Tr. 48:15-19:2). He testified that 40 people were at the LCSO at various times during the early morning hours. (Tr. 63:19-21).

Spec. Agt. Roncinske testified that Det. Smith approached him in one of the hallways of the LCSO Major Crimes Unit. (Tr. 49:8-10). Det. Smith told him that Defendant Wilson had invoked his right to counsel but that he had reinitiated contact with Det. Smith of his own free will and now wanted to talk about the offenses. (Tr. 49:8-21). Spec. Agt. Roncinske testified that Det. Smith did not tell him how Defendant had reinitiated contact. (Tr. 64:21-23). During his conversation with Det. Smith, an investigator brought Defendant into the hallway where Spec. Agt. Roncinske and Det. Smith were located. (Tr. 50:9-11). He did not know who the investigator was. (Tr. 50:12-13). Spec. Agt. Roncinske was not present at any time in the hallway when the Defendant alleged he was patted down by other officers. (Tr. 95:19-22). Defendant was handcuffed at this time. (Tr. 51:7-9). Spec. Agt. Roncinske was aware the Defendant had invoked his right to counsel during the initial interview with Det. Smith and Agt. McCormick, but had been told by Det. Smith that he had reinitiated. (Tr. 52:6-11). Spec. Agt. Roncinske did not read Defendant his <u>Miranda</u> rights. (Tr. 52:1-8).

In the hallway, Spec. Agt. Roncinske introduced himself to the Defendant, showed him his credentials, and told Defendant that it was his understanding that he wanted to talk. (Tr. 52:14-18). Defendant said he did want to talk and asked if it was going to help him. (Tr. 52:21). Spec. Agt. Roncinske responded that he could not make any promises, but that if he cooperated with the Government, down the road his sentence could possibly be reduced. (Tr. 53:11-14). He

never stated that his sentence would definitely be reduced.  (Tr. 53:15-17).  Defendant asked the same question again, and Spec. Agt. Roncinske responded in the same fashion.  (Tr. 53:20-22).

While still in the hallway, Defendant then stated that he was not sure if he knew anything. (Tr. 53:22).  Spec. Agt. Roncinske then played a recorded audio intercept between Harrell and Defendant.  (Tr. 54:5-7; Govt. Ex. #5.)  Spec. Agt. Roncinske had the device with him because he knew at some point that he wanted to play it for one of the defendants because it was very incriminating.  (Tr. 66:4-8).  Spec. Agt. Roncinske felt that the audio was incriminating and wished to bring it to the Defendant's attention.  (Tr. 57:4-8).  He testified that he did not play the conversations on the device in an interview room because he wanted to make sure that Defendant wanted to talk.  (Tr. 66:22-67:1).

Spec. Agt. Roncinske testified that he only played one audio recording to Defendant.  (Tr. 94:8-15).  He stated that after he played the audio intercept in the hallway, he saw Defendant's face visibly change, whereupon Defendant stated that he wanted to talk.   (Tr. 59:12-13, 22-24). Spec. Agt. Roncinske then took Defendant back into Interview Room 2 and activated the video and audio recording.  (Govt. Ex. #4).  Spec. Agt. Roncinske testified, that Defendant said, "The only thing I can do to help myself is . . ."   (Tr. 62:10-12).   Additionally, he testified that Defendant never told him that he wanted an attorney - either in the hallway or during the second interview.  (Tr. 94:18-23).  Defendant made incriminating statements during this interview with Spec. Agt. Roncinske.  (Tr. 62:17-21; Govt. Ex. #4).  Defendant did not invoke his rights during this interview.  (Tr. 62:22-63:3; Govt. Ex. #4).

**Defendant Victor Dongrel Wilson: (Tr. 71-93)**

Defendant testified that he meant to invoke his right to silence when he stated that he wanted to see his lawyer in his first interview.  (Tr. 71:15-18).  He thought saying, "I want to see my lawyer" also invoked his right to silence.  (Tr. 71:10-13).  Defendant has been read his

Miranda rights at least twice in the past and understood them. (Tr. 91:12-18). Defendant testified that he read and signed the Waiver of Rights Form. (Tr. 80:12-15). He stated he voluntarily signed it. (Tr. 80:16-18). However, Defendant stated that he felt like he was not going to be told his charges unless he signed it, but admitted that he was told at least twice that he would know the charges brought against him regardless if he signed the waiver or not. (Tr. 80:21-25). He stated that he wanted to hurry up and find out what he was being charged with. (Tr. 82:1-3). Defendant testified that he failed to state that he did not want to talk or make additional statements. (Tr. 83:22-84:5).

Defendant testified he was brought back to Interview Room 2 after he was placed in Interview Room 3 with Harrell. (Tr. 72:1-6). He testified that Det. Smith stood against the hallway wall and that he was seated in the room. (Id.). The Defendant testified that Det. Smith stated "Do you really think they care about you?" (Tr. 72:5-6). Det. Smith mentioned the comment Defendant made about him to Harrell while in Interview Room 3. (Tr. 72:15-18). Det. Smith stated to Defendant that he had a child and asked him, "Don't you want to be out to be a father to your child?" (Tr. 72:25-73:1). He testified that Det. Smith said, "The only way you can get out of this is if you help us." (Tr. 73:5). Defendant responded to Det. Smith that he did not have anything to tell him and that he was in jail during the time of the alleged crimes. (Tr. 73:7-8).

Defendant sat for roughly twenty-five minutes in Interview Room 2 after Det. Smith left. (Tr. 73:16). Defendant testified that he never knocked on the door or said he wanted to talk. (Tr. 74:2-4). Defendant testified that Det. Smith came back with multiple officers and took him out of the interview room, and into the hallway. (Tr. 73:18-22). Defendant was handcuffed and patted down. (Tr. 73:23-74:4).

In the hallway, Defendant stated that he saw his cousin and asked him if he was all right, upon which he was told to "face up against the door" by officers and was patted down. (Tr. 75:13-19). Spec. Agt. Roncinske approached Defendant and introduced himself. (Tr. 75:21-24). Defendant stated that four other officers were present in the hallway during this time. (Tr. 77:7-15). Defendant stated that Spec. Agt. Roncinske said he wanted to play something for him from a recording device, where he played an audio intercept from telephone conversations. (Tr. 75:24-76:2). Defendant stated that he shook his head upon hearing this and that Spec. Agt. Roncinske asked, "So you want to tell me about this?" (Tr. 76:4-6). Defendant denied his voice on the audio recording to Spec. Agt. Roncinske. (Tr. 76:10-15). Defendant testified that Spec. Agt. Roncinske played four additional audio recordings. (Tr. 76:17-19). Defendant later admitted that his voice was on some of the recordings. (Tr. 93:8-11). Defendant testified that Spec. Agt. Roncinske and another detective told him that he was "caught up in something bigger" than him and that all he needed to do was help and "save yourself so he could go home." (Tr. 85:12-19). He testified that he was told, "You're going to go home if you help us." (Tr. 85:16-17). Defendant testified that he told Spec. Agt. Roncinske that "I got to talk to my lawyer." (Tr. 77:3-4).

Defendant was at the LSCO for about four to five hours. (Tr. 77:18). Spec. Agt. Roncinske brought him back into Interview Room 2 where he asked him questions. (Tr. 76:19-22). Defendant testified that he made up the majority of his incriminating statements to Spec. Agt. Roncinske during his second interview. (Tr. 86:17-23). He stated that he wanted to help himself by making statements to Spec. Agt. Roncinske in the interview room and go home. (Tr. 88:17-22). Defendant testified that at the end of the interview he asked if this was going to help

him.  (Tr. 89:2-4).  Defendant stated that Spec. Agt. Roncinske told him that it would help him. (Tr. 90:15).

## DISCUSSION

The Defendant moves to suppress incriminating statements made during his second interview conducted by Spec. Agt. Roncinske in the early morning hours of October 8, 2011.  As grounds to suppress the statements, Defendant argues he invoked his right to counsel and right to silence at the end of his first interview with Det. Smith and Agt. McCormick, and that any statements he made during his second interview with Spec. Agt. Roncinske violated his Fifth Amendment rights.  The Government argues Defendant never invoked his right to remain silent, just his right to counsel.  Furthermore, the Government argues that Defendant re-initiated communication after he had invoked his right to counsel, thereby waiving his Fifth Amendment rights.

The Fifth Amendment protects an individual from compulsory self-incrimination. U.S. Const. amend. V.  In accordance with this protection, in Miranda v. Arizona, the Supreme Court established procedural safeguards to secure the constitutional rights of persons subject to a custodial interrogation. 384 U.S. 436, 476-79 (1966). See Christopher v. Florida, 824 F.2d 836, 839 (11th Cir. 1987) (motion to suppress granted after agents failed to honor defendant's right to terminate custodial interrogation).  Among the procedural safeguards established by Miranda are an individual's "right to cut off questioning," and the "right to consult with counsel."  385 U.S. at 474-75.

There is no dispute that Defendant invoked his right to counsel during the first interview conducted by Det. Smith and Agt. McCormick when he stated, "I'm gonna go ahead and get me

a lawyer, man."[1] It is clear from constitutional jurisprudence that once Defendant invoked his right to counsel, all interrogation must cease. The Defendant argues though that his right to counsel was not honored by the officers and he was ultimately coerced into speaking with the officers and making incriminating statements. The Court finds it helpful to examine these issues as they unfolded chronologically in the early morning hours of October 8, 2011.

The video of the first interview, as well as Det. Smith's testimony, indicate that Det. Smith and Agt. McCormick ceased the interrogation after Defendant invoked his right to counsel during the first interview in Interview Room 2. (Govt. Ex. #1). The issue now raised by the Parties is if and when Defendant re-initiated contact with the officers and whether Defendant was coerced into speaking with the officers.

### 1. *Whether the Defendant Re-Initiated Contact with Law Enforcement*

The Government argues that Defendant re-initiated communication regarding the offense after he had invoked his right to counsel, thereby waiving his Fifth Amendment rights. (Tr. 104:3-6). The Defendant argues that he did not re-initiate contact with the officers; rather, he was coerced by the officers into speaking with them further after he had invoked his right to counsel. "[A]n accused . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 485-86 (1981). "[E]ven if a

---

[1] Defendant's first interview started at 2:07 a.m. on October 8, 2011 (Govt. Ex. #1). At 2:08 a.m., Det. Smith read Defendant his rights and asked if he understood them. (Tr. 42:16-22; Govt. Ex. #1). Upon Defendant's affirmative response, Det. Smith asked him to read over the Waiver of Rights Form. (Govt. Ex. #1). At 2:12 a.m., Defendant waived his rights, stating, "Man, I waive it, I'll talk to you." (Govt. Ex. #1). Defendant signed the waiver form at this time. (Tr. 13:20-23; Govt. Ex. #1 & #2). Defendant testified that he read and signed the Waiver of Rights Form. (Tr. 80:12-15). He also testified that he voluntarily signed it. (Tr. 80:16-18). From 2:12 a.m. until 2:44 a.m., Defendant talked freely and without hesitation to Det. Smith and Agt. McCormick during the first interview but during this time no incriminating statements were made and Defendant is not moving to suppress any statements made during this first interview. (Govt. Ex. #1).

conversation taking place after the accused has 'expressed his desire to deal with police only through counsel' is initiated by the accused, where re-interrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during interrogation." Oregon v. Bradshaw, 462 U.S. 1039, 1044, (1983); see also Edwards, 451 U.S. at 486 n.9. The preliminary inquiry is whether the defendant initiated the conversation in a manner evincing a "willingness and a desire for a generalized discussion about the investigation." Bradshaw, 462 U.S. at 1045-46. This is to be contrasted with inquiries into the routine aspects of custody, such as asking for a drink of water or to make a telephone call. Id. In Bradshaw, the defendant asked, "Well, what is going to happen to me now?" Id. The Supreme Court found that, although somewhat ambiguous, this question indicated a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. Id. at 1056.

However, "[e]ven if a defendant has initiated contact with the police after requesting counsel, any statements made are still inadmissible unless they are the product of a knowing and voluntary waiver." Dunkins v. Thigpen, 854 F.2d 394, 397 (11th Cir. 1988). To meet this burden, the Government must show that the relinquishment of the right to counsel and right to remain silent was the product of "free and deliberate choice rather than intimidation, coercion, or deception." United States v. Beale, 921 F.2d 1412, 1435 (11th Cir. 1991). Also, the defendant's waiver must have been made "with the awareness of both the right being abandoned and the consequences of the decision to abandon that right." Id. Whether the government has met its burden is determined by the totality of the circumstances. Id.

The first point at which the Government argues that Defendant re-initiated contact with officers was when Det. Smith and Agt. McCormick were executing a warrant to obtain

Defendant's DNA after Defendant had invoked his right to counsel.  (Tr. 24:11-13; Govt. Ex. #1).  Det. Smith testified that he was following the orders of the Court in retrieving the DNA from the Defendant.  (Tr. 24:11-13).  After Agt. McCormick read the DNA warrant to Defendant, Defendant asked several clarifying questions regarding the DNA warrant and shortly thereafter Det. Smith took samples from Defendant.  (Govt. Ex. #1).  The Government argues that Defendant's statements about the DNA sample during his first interview constituted re-initiation after Defendant had invoked his right to counsel because the statements pertained to the case.  (Tr. 112:4-6).  This argument is not well taken.  The video of the interaction does not show that Defendant exhibited a manner evincing a "willingness and a desire for a generalized discussion about the investigation." Bradshaw, 462 U.S. at 1045-46.  Moreover, Det. Smith testified that their discussions regarding the DNA warrant did not constitute re-initiation in his mind.  (Tr. 23:13-18).  The Court recommends Defendant's statements made during the execution of the DNA warrant did not constitute re-initiation.

Sometime later, Det. Smith testified that Defendant knocked on the door to Interview Room 2 to get Det. Smith's attention and told him he wanted to talk.  (Tr. 25:4-24).  The Government argues that this was re-initiation by the Defendant. The Defendant disputes that he knocked on the door and told Det. Smith he wanted to talk.  He testified that he did not do so. (Tr. 74:2-4).  On the other hand, Det. Smith testified that he was seated five to ten feet away from the Defendant's interview room when Defendant knocked on and opened the door and told the Detective that he wanted to talk.  (Tr. 25:8-26:17, 38:21-33:1, 98:15-17).  Det. Smith then retrieved Spec. Agt. Roncinske.  (Tr. 26:23).  Because there is a dispute as to the circumstances surrounding the issue of re-initiation, the Court must perform a credibility analysis.

The Court finds the testimonies of Det. Smith and Spec. Agt. Roncinske more credible than Defendant's testimony regarding this event. Credibility determinations are left to the trial court, because it is the finder of fact who personally observes the testimony and is in the better position to assess witness credibility. United States v. Ramirez–Chilel, 289 F.3d 744, 749 (11th Cir. 2002). A reviewing court will defer to a magistrate judge's determination in evaluating the factual version of events on a motion to suppress evidence, unless the magistrate's understanding of the facts appears to be "unbelievable." Id. (quoting United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985)). When weighing the credibility of witnesses, the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand, and the witnesses' interest in the outcome of the hearing. Ramirez-Chilel, 289 F.3d at 749-50 (11th Cir. 2002.

The Court finds Defendant's testimony regarding re-initiation after he invoked his right to counsel not credible for several reasons. First, Defendant has an obvious interest in the outcome of the hearing. Defendant made incriminating statements during his second interview that would ultimately be harmful to his interests. (Tr. 86:17-23). Defendant also testified that he is a convicted felon and faces significant prison time if convicted. (Tr. 91:7). Furthermore, Defendant's own testimony is contradictory. First, Defendant testified that he told Spec. Agt. Roncinske that his voice was not on the recording when it was played to him. (Tr. 76:10-15, 87:7-8). However, Defendant admitted that his voice was on the tape recording later during his testimony. (Tr. 93:8-11). Further, Defendant testified that the only time he ever asked if talking would help him was at the "end of the video." (Tr. 89:2-7). The audio-video of his second interview shows that at 4:16 a.m., Defendant states, "Can I ask you a question, is this even

helping me any?" (Govt. Ex. #5). However, Defendant testified later that he also asked Spec. Agt. Roncinske if talking would help him while in the hallway before his second interview. (Tr. 89:21-90-9). Additionally, Defendant testified that Spec. Agt. Roncinske told him during the second interview that, "You're going to go home if you help us." (Tr. 86:6-9). However, the audio-recording of the second interview shows that Spec. Agt. Roncinske never made this statement to Defendant. (Govt. Ex. #5).

Moreover, Defendant's demeanor during his testimony was defensive and evasive. During his cross-examination, Defendant did not want to answer a question and stated, "I mean, am I suppose[d] to answer that?" (Tr. 92:17). Furthermore, Defendant testified that he made up a majority of his statements during his second interview. (Tr. 56:17-23). When asked "for no reason?" (as to why Defendant made up the incriminating statements) on cross-examination, Defendant did not respond. (Tr. 87:9-14). Defendant was then asked if he made these incriminating statements "by confessing" because he wanted to help himself, and Defendant responded, "I guess that's what you want to say." (Tr. 88:21-23). For these reasons, the Court finds Defendant's testimony not credible.

To the contrary, the Court finds the testimonies of Det. Smith and Spec. Agt. Roncinske credible. They are consistent with each other and logical with the audio-video recordings of the interviews presented as exhibits during the hearing. Det. Smith testified that upon Defendant's request to talk, he went to locate Spec. Agt. Roncinske. (Tr. 26:23). During this time, Defendant was brought into the hallway by an unknown officer according to Det. Smith's and Spec. Agt. Roncinske's testimonies. (Tr. 29:3-8, 50:12-13, 65:1-4). In the hallway, Spec. Agt. Roncinske introduced himself to the Defendant, showed him his credentials, and told the Defendant that it was his understanding that he wanted to talk. (Tr. 52:14-18). The Defendant said he did want to

talk and asked if it was going to help him. (Tr. 52:21). Both Det. Smith and Spec. Agt. Roncinske testified that Defendant asked if his statements would help him while in the hallway. (Tr. 28:8-9, 52:21). Spec. Agt. Roncinske responded that he could not make any promises, but that if he cooperated with the Government, down the road his sentence could possibly be reduced. (Tr. 53:11-14). Spec. Agt. Roncinske then played a recorded audio intercept between Harrell and Defendant. (Tr. 54:5-7; Govt. Ex. #5). Spec. Agt. Roncinske testified that Defendant's face visibly changed after listening to the recording whereupon Defendant stated that he wanted to talk. (Tr. 59:12-13, 59:22-24). Spec. Agt. Roncinske testified, that Defendant said, "The only thing I can do to help myself is . . ." (Tr. 62:10-12).

As such, the Court finds the testimonies of Det. Smith and Spec. Agt. Roncinske credible and recommends that Defendant re-initiated when he knocked on the door and stated that he wanted to talk and therefore waived his Fifth Amendment right to counsel. (Tr. 25:8-24). It is at this point that Defendant re-initiated as he displayed a "willingness and a desire for a generalized discussion about the investigation." Id. Specifically, Defendant was aware that he abandoned his rights when he wished to talk about the investigation and engaged authorities in discussion about the investigation.[2]

---

[2] Defendant further argues that he not only invoked his right to counsel, but also invoked his right to silence during the initial interview with Det. Smith and Agt. McCormick. Defendant testified that he meant to invoke his right to silence when he stated that he wanted to see his lawyer in the first interview. (Tr. 71:15-18). It is undisputed though that no incriminating statements were obtained from the Defendant prior to the time he re-initiated contact when he knocked on the door and told Det. Smith he wanted to talk and there is no indication that the officers interrogated Defendant prior to this time or coerced him into re-initiating contact. Therefore, even if Defendant did invoke his right to remain silent, it was scrupulously honored prior to the time Defendant re-initiated contact. When a person undergoing a custodial interrogation states that he wishes to remain silent or terminate an interrogation, his request must be scrupulously honored. See Michigan v. Mosley, 423 U.S. 96 (1976); Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir. 1987). A determination of whether the defendant's right to cut off questioning was scrupulously honored and his right to counsel respected, requires a case-by-case analysis. United States v. Hernandez, 574 F.2d 1362, 1369 (5th Cir. 1978).

Defendant's interaction with Spec. Agt. Roncinske during the second interview further evinces his willingness and desire to talk about the investigation. Upon review of the video, the Court notes that Defendant asked multiple times if his statements would help him which demonstrated his willingness to re-initiate and discuss the investigation with Spec. Agt. Roncinske. See Bradshaw, 462 U.S at 1045-46, 1056 (the defendant asked, "Well, what is going to happen to me now?" The Supreme Court found that, although somewhat ambiguous, this question indicated a desire for a generalized discussion about the investigation.). Additionally, Defendant's statement about helping himself indicates that he wanted to talk about the case and thus re-initiated.

Moreover, the audio-video recording showed that at 4:01 a.m. during Defendant's second interview on October 8, 2011, Spec. Agt. Roncinske explained their interaction that had just occurred in the hallway and asked Defendant, "You want to talk to me, right?" (Govt. Ex. #4). Defendant replied affirmatively. (Govt. Ex. #4). This recorded conversation substantiates Det. Smith's claim that Defendant re-initiated contact with authorities. (Tr. 25:8). Additionally, Defendant testified that he asked Spec. Agt. Roncinske in his second interview if his statements would help him, which shows a willingness to talk about that case. (Tr. 89:2-4, Govt. Ex. #4). Furthermore, Defendant's demeanor in the interview with Spec. Agt. Roncinske displayed a willingness to talk about the case. (Govt. Ex. #4). Thus, Defendant re-initiated communication and waived his Fifth Amendment rights. See Bradshaw, 462 U.S. at 1044.

2. *Whether Defendant Was Coerced*

While Defendant alleges that he did not re-initiate contact with the officers, he does argue that he was coerced into making incriminating statements through "psychological games." (Tr. 102:5-11). While Defendant does not specifically point to what he is referring to, the Court

recommends that based on the totality of the evidence presented, including the audio-video of the interactions with the Defendant, as well as the testimony of law enforcement, Defendants argument is without merit. As discussed above, the Defendant's request for counsel during the first interview was honored and Defendant was not interrogated further.

With regard to the instance when Det. Smith spoke to the Defendant when he was transporting him back to Interview Room 2 from Interview Room 3, the Court recommends that Det. Smith's comments to Defendant at that time were not the cause of Defendant's re-initiation. The circumstances of this exchange are as follows: At 2:55 a.m., Det. Smith entered the room, handcuffed the Defendant, and moved him to Interview Room 3 where Co-Defendant Harrell was held. (Tr. 15:7-25; Govt. Ex. #1, #3). Det. Smith testified that this was done in hopes that it would facilitate discussion about the crimes between the two Defendants. (Tr. 17:19-22). Although the Defendants discussed the agents and detectives during this time and made disparaging statements about Det. Smith, they made no incriminating statements, but Defendant argues that this was an effort to "soften him up" and get him to talk. (Tr. 17:23-24; Govt. Ex. #3). While not entirely clear, the Defendant is perhaps arguing that this tactic coerced him into speaking with the officers later. But the Court recommends there was nothing wrong with this procedure and that the authorities in no way violated the Defendant's request for counsel by placing him in an interview room with Harrell. And there is no indication that this caused Defendant to want to speak with the officers further.

At 3:14 a.m., Det. Smith removed Defendant from the shared interview room. (Tr. 18:13-20; Govt. Ex. 3). Det. Smith engaged Defendant in conversation in the hallway during his transportation back to his original interview room:

> And when I brought him back to the room, I had told him, "Before when we talked, you didn't want to do that. I put you in the room with your buddy and you

go right back to acting like that." I said, "You know, you asked for an attorney. I'm not asking you questions." I said, "But with that said, it doesn't prevent me from speaking." And that's what I told him. There was no questions. I was telling him to think about his daughter, think about where his life was going and I reminded him twice that he had an attorney and I did not want him to speak. I was not asking him questions. I wanted him to listen, not speak. (Tr. 22:4-15).

Det. Smith testified that he then closed the door to the interview room and left. (Tr. 24:24-25). He testified that he said this to the Defendant in the hopes of planting a seed and that he wanted Defendant "to think about what he had told me if it was true and he really wanted to be out there for his daughter and he really wanted to be out there for his son, that he would then think about that and maybe with – through his lawyer contact the Government and try to work something out." (Tr. 22:16-23:6).

The facts of this case indicate that the conversation was brief and no questions were asked of the Defendant at that time. Courts have held that appeals to the defendant's emotions, when taken under the totality of the circumstances do not violate the Fifth Amendment's prohibition against coercion. See, e.g., United States v. Haynes, 301 F.3d 669, 684 (6th Cir. 2002) (statement voluntary despite alleged threat of legal action against defendant's girlfriend and daughter because 43-year-old defendant had experience in criminal justice system); United States v. Brave Heart, 397 F.3d 1035, 1037-41 (8th Cir. 2005) (confession voluntary though investigator told defendant that he understood defendant's "stress and pressure" and it was unfair that his son would bear responsibility for death because defendant's will not overborne and conscience prevailed upon him to confess); United States v. Miller, 984 F.2d 1028, 1031-32 (9th Cir. 1993) (confession voluntary though officer, a Mormon bishop, lectured to Mormon defendant that religious tenets required repentance and restitution for wrongdoing because defendant was college-educated and no causal connection between lecture and confession).

Next, Defendant does point to and argues that when Spec. Agt. Roncinske played the audio-intercept recordings to Defendant while they were in the hallway he wanted to "soften him up." (Tr. 101:14-20). But this was only after Defendant had indicated that he wanted to talk with law enforcement, and appellate courts have held confronting suspects with incriminating evidence is not the functional equivalent of interrogation under <u>Innis</u>. For example, in <u>Caputo v. Nelson</u>, 455 F.3d 45, 50-51 (1st Cir. 2006), the court held the state court had not unreasonably applied <u>Innis</u> and <u>Miranda</u> in determining that confronting a suspect with evidence against him did not rise to the functional equivalent of interrogation. Similarly, in <u>United States v. Payne</u>, 954 F.2d 199, 203 (4th Cir. 1992), the court observed that whether police descriptions of incriminating evidence constitute the functional equivalent of interrogation "will depend on circumstances that are too numerous to catalogue." After acknowledging the deference due to the trial court on such matters, the court held a police discussion with the suspect about incriminating evidence did not constitute interrogation because it was not reasonably likely to elicit an incriminating response and the suspect was not subjected to "compelling influences, psychological ploys, or direct questioning." <u>Id</u>. (quoting <u>Arizona v. Mauro</u>, 481 U.S. 520, 529); accord <u>Enoch v. Gramley</u>, 70 F.3d 1490, 1500 (7th Cir. 1995) (identifying the victim and briefly stating the evidence is not the functional equivalent of interrogation). At the time the tape was played, Defendant had already knocked on the door and indicated to Det. Smith that he wanted to talk.

Further, contrary to what the Defendant alleges, Det. Smith and Spec. Agt. Roncinske never promised Defendant any help or leniency. Both Det. Smith and Spec. Agt. Roncinske testified that Defendant asked at least twice if his statements were going to help him. (Tr. 28:8-11, 52:21-53:14). Spec. Agt. Roncinske testified that both times he answered that he could not

make any promises, but that if he did cooperate with the Government, down the road his sentence could possibly be reduced. (Tr. 53:11-14). Det. Smith testified that he overheard Spec. Agt. Roncinske state this to Defendant. (Tr. 28:8-11). Additionally, in the second interview at 4:16 a.m., Defendant asked Spec. Agt. Roncinske if "[is] this even helping me any?" (Govt. Ex. #4). Spec. Agt. Roncinske replied, "If you provide substantial assistance to the Government, yes, it can reduce your sentence, I can't make you no promises but it can help you." (Govt. Ex. #4).

The Court recommends that Det. Smith and Spec. Agt. Roncinske's statements and actions did not constitute coercion. Spec. Agt. Roncinske constantly told Defendant that he could not promise him anything after Defendant asked if his statements could help him. (Tr. 53:11-14). Det. Smith verified these statements made by Spec. Agt. Roncinske in his testimony. (Tr. 28:8-11). Defendant testified that Spec. Agt. Roncinske stated that it can reduce your sentence, but never promised any leniency or help. (Govt. Ex. #5). Under the totality of the circumstances, the Court recommends the Defendant's statements were freely and voluntarily made.

## <u>CONCLUSION</u>

Although Defendant invoked his right to counsel during the first interview, he re-initiated contact with law enforcement. He did so freely and deliberately without threat of intimidation, deception, or coercion. The Court further recommends Defendant's statements made to Spec. Agt. Roncinske after re-initiation were made freely and voluntarily with the Defendant's understanding that he was relinquishing his right to counsel and with full understanding of the consequences of abandoning that right.

Accordingly, it is

**RESPECTFULLY RECOMMENDED:**

The Motion to Suppress by Defendant Victor Dongrel Wilson (Doc. #81) be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this   13th   day of July, 2012.



SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  All parties of record